THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HARLAND SOWERS, Defendant-Appellant.

Fifth District No. 75-170

Opinion filed March 25, 1976.

Ralph Ruebner and Peter B. Nolte, both of State Appellate Defender's Office, of Elgin, for appellant.

W. C. Spomer, State's Attorney, of Cairo (Bruce D. Irish and Myra J. Brown, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE KARNS delivered the opinion of the court:

Defendant-appellant, Harland Sowers, was convicted of armed robbery after a jury trial in Alexander County and sentenced to a term of from 4 to 8 years imprisonment. On appeal defendant contends that he was not proven guilty beyond a reasonable doubt and that he was denied a fair trial by statements of the State's Attorney during final argument referring to defendant's failure to call alibi witness and by references by a police officer to identification of defendant by use of a "mug shot."

On October 24, 1974, William McMillan, then 17 years old, was employed at an automobile filling station in Cairo, Illinois. He testified that about 11:30 p.m. he began to close the station by turning off outside lights, reading the gasoline pumps and counting money. While outside, McMillan heard someone say "Hey" and when he turned he saw a person standing beside the building. The person approached dressed in gray and white pin-stripe coveralls or jump suit, black "combat" boots and a stocking mask, carrying a sawed-off 12-gauge shotgun.

The robber searched McMillan's pockets and forced him into the station where he took approximately $200 from a cash drawer. The robber then sat down to count the money. A car pulled up at the pump whereupon the robber removed his mask and instructed McMillan to tell the customer the station was closed, which he did. When the customer insisted, McMillan agreed to sell him gasoline. McMillan returned to the station to turn on the pumps and the robber gave him money with which to make change. McMillan was with the customer about 35 to 40 feet from the station for approximately 5 minutes and, while he made no effort to tell the customer of the robbery, he did attempt to kick his foot to get his attention. The robber had threatened McMillan not to say anything to the customer.

After the customer left, McMillan returned to the station where the robber was seated at the desk counting money. Another car drove up to the station and the driver approached the door and asked for cigarettes. McMillan told the customer that the station was closed and the

customer left. The robber took only $60, returning the rest of the money and told the attendant "thanks, brother." He ran into a field behind the station having been at the station about 15 minutes.

McMillan stayed at the station and counted the remainder of the money and closed the station. He made no attempt to call the police because he was afraid the robber was still in the vicinity. He left the station intending to call the police from his home but saw a police car and flagged it down. McMillan testified that the robber wore a gold earring in his left ear and that the station was well lit. McMillan positively identified defendant at trial as the robber.

On cross-examination, McMillan stated that he had known defendant for 2 or 3 years but had not known his name though he thought defendant was a "Sowers." McMillan admitted that he had sometimes "come up short" when counting the money at the station and was responsible for such shortages, but denied that his job would be in danger if he were short $50 or $60. McMillan also admitted that on occasion other people, including other employees, would be in the station. The money was kept in a locked drawer although keys other than the one carried by the attendant were kept in the back room. McMillan also admitted that on the night of the robbery the money drawer contained more money than he was allowed to keep out of the safe. Earlier in the evening a car containing four people had stopped at the station. The car had overheated and one of the occupants put water in it without a discussion with McMillan. Defendant later testified that he had stopped at the station early in the evening to put water in the radiator.

After McMillan stopped the police car, the police took details of the offense and then allowed McMillan to drive his car home where they picked him up and went to the filling station. The officers looked in the weeds behind the station but found nothing. They then went to the police station where McMillan looked at two books of photographs. McMillan could not identify any of the pictures. McMillan admitted that he was pressed for an identification and finally had stated that the robber might have been a "Sowers." The police then obtained a picture of defendant from their files and McMillan identified the picture. After defendant was arrested, McMillan identified him in a one-man "showup" through a one-way mirror. Defendant was not dressed as the robber had been but was wearing an earring.

Robert Tolbert, a detective with the Cairo Police Department, testified that he was called to the scene where McMillan stopped a police car. McMillan gave an officer with him the same description related by McMillan. Tolbert later went to the Roslyn Hotel in Cairo after McMillan stated defendant may have been the robber. Tolbert and Officer Steven Thomas found defendant with one Ricky Burgess. When two

other officers arrived with the information that McMillan had positively identified defendant from a "mug shot," the officers arrested defendant and, pursuant to consent by both defendant and Burgess, conducted a search of the room. None of the clothing described by McMillan was found. Under a mattress the officers found $14 belonging to Burgess. On a chair next to the bed the officers found a pair of blue jeans and a shirt which defendant admitted belonged to him. In a pants pocket they found a shotgun shell. These items were introduced at trial.

On cross-examination, Tolbert was vague on how the officers knew that defendant was at the Roslyn Hotel. Tolbert stated that defendant's car was outside the hotel, and he found evidence that "something had been wrong with it." After defendant was taken to the station he was booked and searched but Tolbert could remember nothing found on his person. Tolbert again stated that he found no coveralls, shotgun, or stocking cap and recovered no money and admitted they had not been found in the interval between the robbery and trial. Tolbert also testified that other shotgun shells were found in the hotel room but were not confiscated because Burgess said they belonged to him. On redirect, Tolbert identified defendant as the man arrested.

Steven Thomas, a detective with the Cairo Police Department and Tolbert's partner, corroborated Tolbert's testimony about the arrest and the search of the room. Thomas described the blue jeans as having large cuffs and stated that no debris was found in the cuffs that would indicate that the wearer had been running through weeds. Defendant was fully clothed at the time the pants were found.

Irene McBride was the first defense witness. She testified that she lived with one Carol Wright in an apartment in Cairo. On the evening of the robbery defendant was at their apartment until about 10:15 p.m. and left on foot. She explained that Wright could not appear because of recent dental surgery.

Charles "Skip" Walker testified that between 10:30 and 11 p.m. defendant came to his house. He stayed between 15 and 20 minutes and left on foot.

Defendant Harland Sowers testified that although he had originally lived in Cairo, he now lived in Elgin, Illinois, and had come to Cairo to sell a car he had there. About 4:15 p.m. on the day of the offense he and one Solomon Hatchet, a "disc jockey," and, apparently, Ricky Burgess, drove to Marion, Illinois, to pick up Hatchet's equipment. He stopped at the filling station where the robbery occurred upon his return because his car was running "hot." He asked McMillan where the water was but got no answer. Finally McMillan told him where the water was and defendant put some in the radiator. Defendant then stopped at a pool hall and played pool for a while. Burgess then told him that he

wanted to get "back home tonight" so they left and drove to Charleston, Missouri, with Hatchet to unload his equipment. Defendant and Burgess returned. On their return trip, two belts on defendant's car broke outside of Wyatt, Illinois. Defendant changed the belts so he could drive the car. In Cairo, defendant stopped at a second service station to add more water. They then were close to Burgess' room and defendant asked to go there until morning when he could replace the belts on his car.

From there, Burgess took defendant to Carol Wright's house in his car and waited outside for him. Burgess left when defendant did not reappear soon. Defendant then left on foot and walked to a restaurant to see a girl. She wasn't there so he walked to the house of her brother-in-law, Charles "Skip" Walker. The girl was not there but defendant remained and talked to Walker. He left and began to walk toward the Roslyn Hotel. This was about 11 p.m. On the way he was picked up by a man named "Stan" who took him to the hotel. He joined Burgess in his room and watched television until he went to sleep. About 1 a.m. or shortly thereafter the police arrived. The police searched the room but found nothing but the $14 under the mattress. Defendant was taken to the station where he was placed in front of a mirror. About 20 minutes later, an officer came in with a shotgun shell and told defendant it had been found in his pants pocket. Defendant stated that when the officer had searched the pants on the chair in the hotel room no shell had been found.

On cross-examination, defendant stated that he had seen the pants taken from the hotel room in the Sheriff's office but that the officer had later denied their presence there. The State made no attempt to cross-examine defendant on any other aspect of his testimony.

This was all the evidence presented at the trial. It should be noted, however, that the alibi testified to by defendant at trial is the same as defendant told the police at the time of arrest and is contained in a police report in the record on appeal. The report also confirms the testimony of Irene McBride although the officers spoke only to Carol Wright. The report further confirms the fact that McMillan told the officers that the robber was a "Sowers" only after McMillan failed to identify anyone from two groups of photographs and after other investigation. Defendant did not call Carol Wright, Ricky Burgess, Solomon Hatchet or "Stan" at the trial and the police report does not reflect whether the police made any attempt to interview anyone but Burgess about defendant's alibi.

■■ The State has cited cases standing for the propositions that it is the duty of the jury to determine the credibility of the witnesses and the weight of the evidence, that the positive identification testimony of

a single witness with opportunity to view the perpetrator is sufficient to support a conviction, that the jury is under no obligation to believe a defendant's alibi, and that the reviewing court should not disturb the jury's verdict unless the evidence is so unsatisfactory as to indicate a reasonable doubt of defendant's guilt. These principles are so basic in Illinois and so well recognized by this court and other courts that no citation of authority is necessary here.

On the other hand, Illinois courts have not been reluctant to reverse the verdict where the evidence taken as a whole leaves a reasonable doubt of defendant's guilt. (*People v. Gokey*, 57 Ill. 2d 433, 312 N.E.2d 637 (1974).) In *People v. Dawson*, 22 Ill. 2d 260, 265, 174 N.E.2d 817 (1961), the court stated, "Where the State's evidence is improbable, unconvincing and contrary to human experience, we have not hesitated to reverse the judgments of conviction." (See also *People v. Garner*, 19 Ill. App. 3d 728, 312 N.E.2d 678 (1974).) In the instant case we are forced to conclude that the evidence is of such a character.

■■ The improbability begins with the occurrence itself. The robbery began as any other robbery would. The robber was disguised and armed. He ordered McMillan into the station and had McMillan turn over cash contained in the drawer. At that point, the robber, instead of fleeing, sat at a desk and began to count the money. When a customer drove up, the robber unmasked himself to a victim whom he knew, thus negating the entire purpose of the disguise. He gave McMillan change to give to the customer and allowed McMillan to walk 35 to 40 feet outside the building, at no time knowing whether McMillan would have the man alert the police. Upon McMillan's return, the robber still did not flee but continued to sit and count the money. No explanation appears of record where the shotgun was all this time. A second customer arrived, walking up to the door. Still the robber made no attempt to flee. After the second customer left, the robber gave McMillan $140, said "thanks, brother" and told McMillan the gun was not loaded anyway. He then fled on foot. Although a telephone is located in the station, McMillan made no attempt to call the police but instead continued to count money and close the station. This series of events is at least improbable if not incredible.

When McMillan flagged down a police car, the police, after obtaining details, allowed McMillan to drive his car home before they investigated the scene of this recent crime or searched the area for a suspect. There is no evidence that the police searched the station itself for clues.

McMillan then went to the police station to view photographs but could identify none. During this time the police were out looking for the suspect. Only after failing to find the robber in two police "mug books" did McMillan, after admitted pressure from the police, tell them

that he thought the robber had been a "Sowers." McMillan had admitted seeing defendant on the street several times prior to this date. McMillan then immediately identified defendant's picture and his identification was reinforced by a questionable one-man showup at police headquarters.[1]

McMillan's credibility is further weakened by defense counsel's perceptive questioning on cross-examination about McMillan's usual procedure, past shortages, his permission of others, including former employees, to remain in the station while McMillan waited on customers, and the presence of other keys to the cash drawer.

Although defendant had been in Cairo only a few days, he was found immediately by police, within 1 to 1½ hours of the robbery. Nothing incriminating was found except the shotgun shell. Three identical shells were found in the room but were not confiscated solely because Burgess stated they belonged to him. Defendant gave the police a detailed and complicated alibi which he repeated without contradiction at trial 2½ months later without cross-examination by the State. The only two alibi witnesses apparently interviewed by the police corroborated relevant portions of defendant's alibi. Furthermore, Officer Tolbert confirmed that perhaps "something had been wrong" with defendant's car. No evidence appears that the police had attempted to contact defendant's other alibi witnesses even after confirmation of part of the alibi. The police report reflects little interrogation of Burgess with vague results. Nor is there an indication that the police sought the two customers who approached the filling station while the robbery was in progress.

The final point of interest is that, although defendant had at most 1½ hours to dispose of the stocking cap, coveralls, combat boots, shotgun, and $60, the police could find no trace that they ever existed in 2½ months of investigation.

Viewing all of the evidence in the light most favorable to the State we must conclude that it is so improbable, incredible, unsatisfactory and contrary to human experience as to indicate at least a reasonable doubt of defendant's guilt.

The judgment of the Circuit Court of Alexander County is reversed.

Reversed.

EBERSPACHER and G. J. MORAN, JJ., concur.

---

[1] The showup at police headquarters may have been unduly suggestive. Defendant admitted at oral argument that the issue was not raised on appeal because no motion to suppress had been filed in the trial court. While we are in no position to review the constitutional aspects of the identification procedure, we feel no reluctance to consider the factual context of the showup in our discussion of the credibility and sufficiency of the evidence.